IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

GREGORY P. MCBRIDE,       )
                             )
          Plaintiff,       )
                             )
      vs.                )     CV. NO. SA-12-CV-00489-DAE
                             )
AMER TECHNOLOGY, INC. ,   )
                             )
          Defendant.    )
_____ )

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On June 5, 2013, the Court heard Defendant Amer Technology, Inc.'s, Motion for Summary Judgment ("Motion"). ("Mot.," Doc. # 16.) Adrian A. Spears, Esq., and Charles H. Sierra, Esq., appeared at the hearing on behalf of Plaintiff Gregory McBride; Michael Lamoine Holland, Esq., appeared at the hearing on behalf of Defendant Amer Technology, Inc. After reviewing the Motion and the supporting and opposing memoranda, the Court **GRANTS** Defendant's Motion.

## BACKGROUND

Gregory McBride ("Plaintiff") was employed by Amer Technology, Inc. ("Defendant") from 2003 to 2012, first as an Account Executive and later as a Vice President. ("FAC," Doc. # 12 ¶ 4; "McBride Depo.," Mot. Ex. 2 at

1

63:22–23.)  Balwinder Dhillon ("Dhillon"), Defendant's President and Chief

Executive Officer, was Plaintiff's direct supervisor.  ("Cupit Depo.," Mot. Ex. 3 at

21:3–4.)  In August 2010, Defendant hired Joe Villalobos ("Villalobos").  (FAC

¶ 6.)  Plaintiff acknowledges that Villalobos was not his supervisor "[o]n paper,"

but claims that he reported to Villalobos in practice.  (McBride Depo. at 92–93.)

Defendant disputes this, claiming that Plaintiff continued to report directly to

Dhillon after Villalobos was hired.  (Cupit Depo. at 35:19–25.)  Villalobos and

Plaintiff became very close friends.  (McBride Depo. at 93:8–9 ("At first we were

real good friends and . . . talked about everything."); "Villalobos Depo.," Mot. Ex.

4 at 46:18 ("We were extremely good friends.").)  On May 31, 2011, Plaintiff was

demoted from Vice President to Account Executive.  (Mot. Ex. 5.)  His salary and

job duties didn't change; Defendant "just took away the VP title because he wasn't

acting like a VP."  (Cupit Depo. at 58:10–12.)

Plaintiff has a "minor case" of Tourette's syndrome, a neurological

disorder that makes him snort and make facial movements when he's not focused.

(McBride Depo. at 34:9–16, 35:7.)  At some point after Plaintiff was demoted on

May 31, 2011, he found out from three of his coworkers—Jen Walker, Adam

Ward, and Ruben—that Villalobos was "making fun of [Plaintiff's] Tourette's

behind [his] back. . . ."  (McBride Depo. at 98:6–8, 16–17.)  On August 8, 2011,

2

Villalobos made a comment about Plaintiff's Tourette's syndrome in front of

Plaintiff and Adam Ward.  (Opp. Ex. 5.)  The next day, August 9, 2011, Plaintiff

told Paula Carter ("Carter"), a member of Defendant's Human Resources

Department, that Villalobos was making fun of him for having Tourette's

syndrome.  (McBride Depo. at 105:19–25.)  Carter, Dhillon, and Glenda Cupit

("Cupit"), Defendant's Chief Financial Officer, investigated Plaintiff's complaint.

(Cupit Depo. at 37–38.)  Following their investigation, Villalobos was relocated to

another office and ordered not to have any contact with Plaintiff.  (Id. at 38:13–14;

Villalobos Depo. at 56–57.)  On August 16, 2011, Plaintiff filed a Charge of

Discrimination with the Equal Employment Opportunity Commission ("EEOC"),

asserting that he believed he was being discriminated against on the basis of a

disability.  (Opp. Ex. 7.)

        In September of 2011, Plaintiff and six other members of Defendant's

sales staff signed employment contracts.  ("Dhillon Aff.," Mot. Ex. 6.)  The

contracts included commission plans and non-compete agreements.  (Id.)

Plaintiff's commission plan provided that the salary of a new employee, Stephen

Glusing ("Glusing"), would be charged to Plaintiff's accounts, and in return

Plaintiff would collect a commission on business Glusing generated.  (See Mot.

Ex. 5 at 11; Dhillon Aff.)  When Plaintiff received his bonus for the fourth quarter

of 2011, he discovered that $15,000 had been deducted to pay part of Glusing's salary.  (McBride Depo. at 172:18–19.)  On February 8, 2012, Plaintiff sent an e-mail to Dhillon and Cupit asking to be released from the non-compete agreement and informing them that he would "pursue all legal avenues if rejected."  (Mot. Ex. 5 at 4.)  On February 13, 2012, Plaintiff resigned.  (Mot. Ex. 5 at 5.)

On May 17, 2012, Plaintiff filed his initial Complaint in this action. (Doc. # 1.)  Defendant filed an Answer on June 20, 2012.  (Doc. # 4.)  On October 26, 2012, Plaintiff filed a Motion for Leave to File a First Amended Complaint (doc. # 11), which the Court granted on October 30, 2012.  That same day, Plaintiff filed his First Amended Complaint ("FAC").  (FAC.)  The FAC asserts claims under the Americans with Disabilities Act (ADA) and the Texas Commission on Human Rights Act (TCHRA) for disability-based discrimination and harassment; retaliation; and constructive discharge.  On March 25, 2013, Defendant filed the Motion for Summary Judgment currently before the Court.  (Mot.)  Plaintiff filed a Response in Opposition on April 8, 2013 ("Opp.," doc. # 18), and on April 15, 2013, Defendant filed a Reply in further support of its Motion ("Reply," doc. # 19).

<u>LEGAL STANDARD</u>

I.     <u>Summary Judgment</u>

Summary judgment is granted under Federal Rule of Civil Procedure 56 when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Cannata v. Catholic Diocese of Austin</u>, 700 F.3d 169, 172 (5th Cir. 2012).  The main purpose of summary judgment is to dispose of factually unsupported claims and defenses.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323–24 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  <u>Id.</u> at 323.  If the moving party meets this burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial.  <u>ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.</u>, 699 F.3d 832, 839 (5th Cir. 2012).  In deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  <u>Brown v. City of Hous.</u>, 337 F.3d 539, 541 (5th

Cir. 2003).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

## DISCUSSION

Plaintiff asserts claims under the ADA and the TCHRA for disability-based discrimination and harassment.  (FAC ¶¶ 14–19.)  He alleges that he was harassed by his co-worker, Villalobos, because he has Tourette's syndrome, and claims that Defendant failed to reasonably accommodate his disability.  Plaintiff also alleges that Defendant violated the ADA and the TCHRA when it retaliated against him for reporting disability-based harassment to Defendant's Human Resources Department and the EEOC.  (FAC ¶ 14.)  According to Plaintiff, the conditions became so intolerable that he was ultimately forced to resign, and was thus constructively discharged.  (Id.)  Defendant moves for summary judgment on each of Plaintiff's claims.

I.     Disability-Based Discrimination and Harassment

Plaintiff brings suit under the TCHRA, Tex. Lab. Code § 21.051, and the ADA, 42 U.S.C. § 12101 et seq.  Both the TCHRA and the ADA prohibit

6

employment discrimination on the basis of an individual's disability.[1]  Given the similarity between the statutes, Texas courts and the Fifth Circuit treat TCHRA claims as analogous to ADA claims.  See Rodriguez v. ConAgra Grocery Prods. Co., 436 F.3d 468, 473–74 (5th Cir. 2006) (analyzing the plaintiff's TCHRA claim under "analogous federal precedents and their interpretation of the [ADA]"); Pegram v. Honeywell, Inc., 361 F.3d 272, 285 n.13 (5th Cir. 2004) ("We have previously held that the TCHRA claim is analogous to the ADA claim, and generally would be treated similarly.") (citing Talk v. Delta Airlines, Inc., 165 F.3d 1021 (5th Cir. 1999)); NME Hosps., Inc. v. Rennels, 994 S.W.2d 142, 144 (Tex. 1999) ("[I]n light of the Legislature's express purpose, we look to analogous federal precedent for guidance when interpreting the Texas Act.").  Accordingly, the Court will address Plaintiff's claims under the TCHRA and the ADA together.

Plaintiff alleges that he was the victim of disability-based

---

[1] The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Under the TCHRA, an employer commits an "unlawful employment practice" if "because of race, color, disability, religion, sex, national origin, or age," the employer "fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual" or "limits, segregates, or classifies an employee . . . in a manner that would . . . adversely affect . . . the status of an employee."  Tex. Lab. Code § 21.051.

discrimination.  In cases—such as this one—where only circumstantial evidence is offered to show the alleged unlawful employment discrimination, courts apply the Title VII burden-shifting analysis enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See McInnis v. Alamo Cmty. Coll. Dist., 207 F.3d 276, 279–80 (5th Cir. 2000).  Under the McDonnell Douglas framework,

> a plaintiff must first make a prima facie showing of discrimination by establishing that: (1) He is disabled or is regarded as disabled; (2) he is qualified for the job; (3) he was subjected to an adverse employment action on account of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees.

Id.  Once the plaintiff makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Id.  If the employer articulates such a reason, the burden shifts back to the plaintiff to establish that the articulated reason was merely a pretext. Id.

Plaintiff also alleges that he was the victim of disability-based harassment.  In Flowers v. Southern Regional Physician Services, 247 F.3d 229, 235 (5th Cir. 2001), the Fifth Circuit recognized a cause of action for disability-based harassment under the ADA.  To prevail on such a claim, a plaintiff must prove:

> (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was

8

> based on her disability or disabilities; (4) that the harassment
> complained of affected a term, condition, or privilege of employment;
> and (5) that the employer knew or should have known of the
> harassment and failed to take prompt, remedial action.

Flowers, 247 F.3d at 235–36.  In order to rise to the level of an actionable offense,

the harassment "must be sufficiently pervasive or severe to alter the conditions of

employment and create an abusive working environment."  Gowesky v. Singing

River Hosp. Sys., 321 F.3d 503, 509 (5th Cir. 2003) (quoting Flowers, 247 F.3d at

236).  In order to determine whether an environment is abusive, courts are directed

to look at "all the circumstances, including the frequency of the discriminatory

conduct, its severity, whether it is physically threatening or humiliating, or a mere

offensive utterance, and whether it unreasonably interferes with an employee's

work performance."  Shepherd v. Comptroller of Pub. Accounts of State of Tex.,

168 F.3d 871, 874 (5th Cir. 1999) (addressing a sexual harassment hostile work

environment claim).  "[S]imple teasing, offhand comments, and isolated incidents

(unless extremely serious) will not amount to discriminatory changes in the terms

and conditions of employment."  Id. at 874 (quoting Faragher v. City of Boca

Raton, 524 U.S. 775, 788 (1998)) (internal quotation marks omitted).[2]

---

[2]  Defendant appears to believe that the McDonnell Douglas framework also
applies to this claim, arguing that Plaintiff cannot prevail even if he establishes the
five elements of a disability-based harassment claim because Defendant has a
"legitimate, non-discriminatory reason for its behavior toward Plaintiff."  (Mot. at

An element common to both claims is that the plaintiff must be "disabled."  See Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 222 (5th Cir. 2011) ("As a threshold requirement in an ADA claim, the plaintiff must, of course, establish that he has a disability.") (quoting Waldrip v. Gen. Elec. Co., 325 F.3d 652, 654 (5th Cir. 2003)).  Defendant argues that there is no genuine issue of material fact regarding whether Plaintiff suffers from a disability protected by the ADA, and that his claims for disability-based discrimination and harassment therefore fail.  The Court agrees.

A.    Plaintiff Was Not Disabled or "Regarded as Disabled"

In order to prevail on his disability-based discrimination and harassment claims, Plaintiff must establish that he suffered from a disability. Under the ADA, "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a

---

15.)  However, the framework is not applicable to claims of hostile work environment, except in very limited circumstances.  See Hayatdavoudi v. Univ. of La. Sys. Bd. of Trs., 240 F.3d 1073, 2000 WL 1835143, at *3 n.10 (5th Cir. 2000) (unpublished table decision) ("Normally, the McDonnell Douglas framework is used in analyzing claims of discrimination based on adverse employment action. . . .  Because, however, [plaintiff] contends that past employment actions are evidence of a hostile work environment, we must evaluate those actions for discriminatory animus.  The McDonnell Douglas framework is an appropriate device by which to do so.").

record of such an impairment; or (C) being regarded as having such an impairment. . . ." 42 U.S.C. § 12102(1).  In the FAC, Plaintiff appears to assert that he is disabled in the conventional sense; in other words, that his Tourette's syndrome substantially limits his major life activities.  In the instant Motion, Defendant contends that Plaintiff cannot establish that he is actually disabled as that term is defined by § 12102(1)(A).  (Mot. at 14.)  In response, Plaintiff argues that, even if not disabled under subsection (A), he was "regarded as" disabled under subsection (C).  (Opp. at 9–10.)  The Court concludes that Plaintiff does not satisfy the definition of "disabled" under either subsection.

1.   <u>Plaintiff's Tourette's Syndrome Did Not Substantially Limit His Major Life Activities</u>

For purposes of subsection (A), "major life activities include, but are not limited to caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12101(2)(A).  A major life activity also includes "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  42 U.S.C. § 12101(2)(B).  Whether an impairment substantially limits a major life activity is to be determined "without

11

regard to the ameliorative effects of mitigating measures," such as medication,

equipment, prosthetics, and other assistive technology.  42 U.S.C.

§ 12102(4)(E)(I).  Furthermore, "[a]n impairment need not prevent, or significantly

or severely restrict, the individual from performing a major life activity in order to

be considered substantially limiting."  29 C.F.R. § 1630.2(j)(1)(ii).  Rather, an

impairment is a disability if it substantially limits the individual's ability to

perform major life activities compared to most people in the general population.

29 C.F.R. § 1630.2(j)(1)(ii).

        During his deposition, Plaintiff described Tourette's syndrome, and its

impact on him, as follows:

> It's a neurological dysfunction.  It's – there is various levels of it.  My
> case is the one in 95 where you have general involuntary movements
> or stress-related movements.  When focused, I don't snort or move my
> face at all.  When you have a lack of focus – and, you know, cases are
> so different.  In my case when I have a lack of focus, I'll snort and
> move my face more.  Some people have different involuntary signs,
> like the blinking vice.

(McBride Depo. at 34:9–16.)  Plaintiff stated that he does not make "involuntary

very loud noises," as some people who suffer from "severe case[s]" of Tourette's

syndrome do.  (Id. at 34:19–23.)  During his deposition, Plaintiff was also asked:

"Would you consider yourself to have a milder case?"  (Id. at 34–35.)  He replied:

> Yes, sir. . . .  I have a minor case where it – it's . . . noticeable.  Like, I
> mean you, you'll hear me, you know, snorting out again and moving

12

my face or eyes, but . . . it's not bad like [an individual who makes involuntary very loud noises]. . . .   It's mostly prevalent when you're not paying attention or focused on anything.

(Id. at 35:2–9, 16–17.)

Plaintiff also suffers from vertigo, which is unrelated to Tourette's syndrome and makes Plaintiff feel "delusional with a lack of balance."   (Id. at 9:11–18.)  Plaintiff takes one medication (Meclizine), an antihistamine that Plaintiff says treats symptoms of vertigo and helps him focus.[3]  (Id. at 8–9.) During his deposition, Plaintiff stated that neither vertigo nor Tourette's syndrome limit him in any way.  (Id. at 34:3–7.)  When asked whether he's "100 percent functional," he replied: "I like to believe so, yes, sir."  (Id. at 35:24–25.)  On the EEOC Intake Questionnaire Plaintiff submitted on February 14, 2012, one of the questions was: "What is the disability that you believe is the reason for the adverse action taken against you?  Does this disability prevent or limit you from doing anything?  (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc)."  In response, Plaintiff wrote: "Tourette's" and "No; I am 100% functional."

---

[3]
Q: So you're taking it for focus and vertigo?
A: Yeah. . . . [I]t helps me not snort as much. . . .  It just makes me feel more focused, like a – like a coffee or a Red Bull. . . .  It – it – it improves part of Tourette's, but also the vertigo.  It prevents vertigo. So it's – it's been the best medication for me.
(Id. at 8–9.)

(Mot. Ex. 5 at 6–9.)

Defendant argues that, in light of this evidence, no genuine issue exists as to whether Plaintiff's Tourette's syndrome substantially limits any of his major life activities.  (Mot. at 14.)  In response, Plaintiff states that "[t]here is no question that [Plaintiff's Tourette's] is a disability and has to takes medication [sic]," but does not identify <u>any</u> major life activities that are limited by his impairment, substantially or otherwise.  (<u>See</u> Opp. at 9–10.)  Plaintiff does not point to any evidence indicating that his ability to perform major life activities is limited in any way compared to most people in the general population.  The Court therefore concludes that there is no genuine dispute regarding whether Plaintiff qualifies as "disabled" under § 12102(1)(A).  The Court thus turns to subsection (C).

2.    <u>Plaintiff Was Not "Regarded As" Disabled</u>

A plaintiff whose impairment does not substantially limit any major life activities may nevertheless bring suit under the ADA if he is "regarded as having such an impairment."  42 U.S.C. § 12102(1)(C).  Until the passage of the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110–325, 122 Stat. 3553 (Sept. 25, 2008), a plaintiff could establish a "regarded as" claim in this circuit if he could show that: "(1) a covered entity mistakenly believes that [he] has a

14

physical impairment that substantially limits one or more major life activities, or

(2) a covered entity mistakenly believes that an actual, nonlimiting impairment

substantially limits one or more [of his] major life activities." Kemp v. Holder,

610 F.3d 231, 237 (5th Cir. 2010) (quoting Sutton v. United Air Lines, Inc., 527

U.S. 471, 489 (1999), superseded by Pub. L. No. 110-325, 122 Stat. 3553 (2008)).

This test required that the plaintiff "demonstrate that the employer actually

'entertain[ed] misperceptions about the individual. . . .'" Id. (quoting Sutton, 527

U.S. at 489) (alteration in original).

    However, the ADAAA expanded the definition of "disability,"

including what it means to be "regarded as" disabled.  The applicable federal

regulation now states that an individual is "regarded as having such an

impairment" if he "is subjected to a prohibited action because of an actual or

perceived physical or mental impairment, whether or not that impairment

substantially limits, or is perceived to substantially limit, a major life activity."  29

C.F.R. § 1630.2(l)(1). Prohibited actions include, but are not limited to, "refusal to

hire, demotion, placement on involuntary leave, termination, exclusion for failure

to meet a qualification standard, harassment, or denial of any other term, condition,

or privilege of employment."  29 C.F.R. § 1630.2(l)(1).

    Defendant objects to Plaintiff's invocation of § 12102(1)(C), pointing

15

out that Plaintiff did not assert a "regarded as" claim in the FAC, or allege facts that would put Defendant on notice that Plaintiff intended to argue that he was "regarded as" disabled.  (Reply at 6–7.)  Defendant contends that certain of Plaintiff's allegations are simply incompatible with a "regarded as" claim, such as his allegation that Defendant failed to accommodate his disability.  (Reply at 7 (citing Newberry v. E. Tex. State Univ., 161 F.3d 276, 280 (5th Cir. 1998) (noting that an employer need not provide reasonable accommodation to an employee merely because the employer thinks the employee has an impairment)).)  According to Defendant, Plaintiff may not rely on § 12102(1)(C) without having specifically alleged in the FAC any facts indicating that Defendant regarded him as disabled.  Defendant cites to a number of cases to support this argument.  See Rivera-Mercado v. Scotiabank De Puerto Rico-Int'l, 571 F. Supp. 2d 279, 289 (D. P.R. 2008) (holding that the plaintiff could not rely on the "regarded as" definition of disabled where "the first time that Plaintiff alleged that [her employer] regarded her as disabled was in the opposition to the request for summary judgment"); cf. Dean v. Westchester Cnty. P.R.C., 309 F. Supp. 2d 587, 595–96 (S.D.N.Y. 2004) (dismissing the plaintiff's "regarded as" claim where the complaint failed to allege sufficient facts to show that the plaintiff was regarded as having an impairment).

Defendant also argues that Plaintiff's "regarded as" claim must be

16

dismissed because Plaintiff failed to exhaust his administrative remedies.

Plaintiff's EEOC charge makes no reference to discrimination on the basis of a

<u>perceived</u> disability, nor, according to Defendant, does it "identify facts which

could reasonably support such a claim." (Reply at 7–8.) A number of courts have

held that a plaintiff fails to exhaust administrative remedies with respect to a

"regarded as" claim if he makes no reference to such a claim in his EEOC charge.

<u>See</u> <u>Cadely v. New York City Dept. of Transp.</u>, No. 04-CV-8196(FM), 2008 WL

465199, at *10 (S.D.N.Y. 2008) (where nothing in the EEOC charge provided the

agency with notice to investigate discrimination on the basis of the employer's

inaccurate perception of the plaintiff's condition, the court lacked jurisdiction to

hear the plaintiff's "regarded as" or "record of" claims); <u>Kear v. Bd. of Cnty.</u>

<u>Comm'rs of Sedgwick Cnty., Kan.</u>, 491 F. Supp. 2d 1052, 1055 (D. Kan. 2007)

(holding that the plaintiff had not exhausted administrative remedies with respect

to her "regarded as" claim where her EEOC charge stated only "I am disabled").

On the basis of these arguments, Defendant urges the Court to ignore

Plaintiff's claim—asserted for the first time in his response to Defendant's

Motion—that he qualifies as disabled because he was "regarded as having such an

impairment" by Defendant. However, the Court concludes that it need not

determine whether Plaintiff's "regarded as" claim is barred on either ground

asserted by Defendant, because, in any event, Plaintiff has failed to produce evidence that he was "regarded as having such an impairment."

In order to establish that he was regarded as having an impairment that substantially limits a major life activity, Plaintiff must demonstrate that he was subjected to prohibited action by Defendant because he suffers from Tourette's syndrome.  See 29 C.F.R. § 1630.2(l)(1).  Plaintiff does not identify any prohibited actions that he was subjected to by Defendant, merely asserting: "In this case there is no question that [Plaintiff] was regarded as disabled.  The problem started when [Villalobos] made fun of [Plaintiff's Tourette's]. . . ."  (Opp. at 10.)  The Court will assume—generously—that Plaintiff is arguing that he was subjected to harassment (a prohibited action) by Villalobos because of his Tourette's syndrome.

During his deposition, Plaintiff testified that Villalobos made comments about Plaintiff having "demons . . . multiple times" and about Tourette's syndrome "a couple of time[s]."  (McBride Depo. at 128:4–9.)  When pressed, Plaintiff could not recall what Villalobos said about his Tourette's syndrome the "couple of time[s]" Villalobos made comments.  Plaintiff testified: "I can't remember 100 percent what he exactly said . . .  I don't – really don't remember.  It was something simple and subtle, but just to the point. . . ."  (McBride Depo. at 130:12–16.)  Plaintiff also testified that he was told by co-workers that Villalobos

18

was "making fun of [his] Tourette's behind [his] back. . . ."  (McBride Depo. at

98:6–9.)  On one occasion, Villalobos made a comment about Plaintiff's Tourette's

syndrome in the presence of Adam Ward ("Ward"), one of Plaintiff's co-workers.

Ward executed an affidavit stating: "On August 8th 2011 I heard Joe Villalobos

inform Greg McBride that he would be more effective in his business development

if he were not to allow his Tourettes Syndrome to affect his business related

conversations with his clients and/or potential clients."  (Opp. Ex. 5.)

   The governing regulations do not define "harassment" for the

purposes of § 1630.2(l)(1).  However, as stated above, in order to be actionable

under the ADA, harassment generally "must be sufficiently pervasive or severe to

alter the conditions of employment and create an abusive working environment."

Gowesky, 321 F.3d at 509.  The alleged harassment Plaintiff was subjected to by

Villalobos falls far short of this standard.  The frequency of discriminatory

conduct, its severity, whether it is threatening or merely offensive, and whether it

unreasonably interferes with an employee's work performance are all relevant

factors in assessing whether it creates an abusive working environment.  Shepherd,

168 F.3d at 874.  According to Plaintiff's testimony, Villalobos made comments

about Plaintiff's Tourette's syndrome under ten times: a "couple of times" to

Plaintiff's face, two or three times to Plaintiff's co-workers (McBride Depo. at

106:9–11), and once when Ward was present.  The alleged harassment did not,

therefore, occur with any frequency.  Plaintiff cannot recall the substance of most

of Villalobos's comments, which makes it impossible for the Court to assess their

severity.  However, that Plaintiff cannot recall what Villalobos said suggests to the

Court that the comments did not have a significant impact on Plaintiff.  The only

documented comment made by Villalobos—that Plaintiff "would be more effective

in his business development" if his Tourette's syndrome did not affect his business

conversations (Opp. Ex. 5)—was clearly considered offensive by Plaintiff, but was

certainly not threatening or abusive.  The Court therefore concludes that Plaintiff

was not "regarded as" disabled by virtue of Villalobos's alleged harassment.

There is no evidence that Plaintiff was subjected to any other

prohibited actions because he suffered from Tourette's syndrome.  On the contrary,

Plaintiff worked for Defendant for nine years, and over the course of his

employment received "five or six" promotions and increases in pay.  (McBride

Depo. at 64:1-17.)  Plaintiff was once demoted, from Vice President to Account

Executive, without any corresponding pay cut.  (Mot. Ex. 5.)  However, even

Plaintiff does not appear to assert that his demotion had anything to do with his

Tourette's syndrome; apparently, it had to do with Plaintiff's failure to attend a

number of weekly sales meetings and other misconduct.  (Id.; McBride Depo. at

20

88–89; Cupit Depo. at 21–22, 58:10–12; Villalobos Depo. at 52–53.)  During her

deposition, Cupit testified that she was not aware that Plaintiff suffered from

Tourette's syndrome until August 2011, when he complained about Villalobos.

(Cupit Depo. at 35:2–5.)  Plaintiff's direct supervisor, Dhillon, stated in his

affidavit: "I knew [Plaintiff] had Tourettes but that fact made no difference in my

employment decisions.  In fact, I really didn't even notice the Tourettes and would

not have known about it if he had not told me himself."  (Dhillon Aff.)

       The Court concludes that there is no evidence that Plaintiff was

regarded as having an impairment that substantially limits a major life activity.

Accordingly, Plaintiff has failed to demonstrate that there is any genuine issue of

material fact as to whether he is disabled under the ADA.  As this is a threshold

requirement, the Court **GRANTS** Defendant's Motion insofar as it seeks summary

judgment on Plaintiff's disability-based discrimination and harassment claims

under the ADA and the TCHRA.

II.    <u>Failure to Accommodate</u>

       Plaintiff also alleges that Defendant failed to accommodate his

disability.  Although both Plaintiff and Defendant address this as separate from

Plaintiff's disability discrimination claim, an employer's failure to accommodate is

simply a form of disability discrimination under the ADA.  The ADA's definition

of "discrimination against a qualified individual on the basis of disability" includes

"not making reasonable accommodations to the known physical or mental

limitations of an otherwise qualified individual with a disability who is an

applicant or employee. . . ."  42 U.S.C. § 12112(b)(5)(A).  In order to prevail on a

claim of disability discrimination based on an employer's failure to provide

reasonable accommodations, a plaintiff must have a disability as that term is

defined by the ADA.[4]  For the reasons discussed above, Plaintiff has failed to

establish that he is disabled under the ADA.  Moreover, the Fifth Circuit has held

that an employer cannot be held liable for failing to provide an accommodation if

the employee fails to request one.  Taylor v. Principal Fin. Grp., Inc., 93 F.3d 155,

165 (5th Cir. 1996).  Plaintiff acknowledges that he never requested any

accommodations from Defendant.  (McBride Depo. at 189:9–10.)  For these

reasons, Plaintiff cannot sustain a disability discrimination claim based on failure

to accommodate.  The Court therefore **GRANTS** Defendant's Motion insofar as it

seeks judgment on that claim.

---

[4]  To establish a prima facie case of discrimination based on failure to accommodate a disability, a plaintiff must show that: (1) his employer is covered by the statute; (2) he is an individual with a disability; (3) he can perform the essential functions of the job with or without reasonable accommodation; and (4) his employer had notice of the disability and failed to provide accommodation. Mzyk v. N.E. Indep. Sch. Dist., 397 F. App'x 13, 16 n.3 (5th Cir. Sept. 30, 2010).

III.   <u>Retaliation</u>

      Plaintiff alleges that he was retaliated against for reporting Villalobos's conduct to Defendant's management and for filing a complaint with the EEOC, in violation of the ADA and the TCHRA.  (FAC ¶ 5.)  The ADA prohibits employers from discriminating against any individual "because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  Claims of unlawful retaliation under the ADA are analyzed according to the <u>McDonnell Douglas</u> framework.  <u>Sherrod v. American Airlines, Inc.</u>, 132 F.3d 1112, 1121–22 (5th Cir. 1998).

      Under that framework, the plaintiff must first establish a prima facie case of retaliation.  To do so, the plaintiff must show that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the first two elements.  <u>Jenkins v. Cleco Power, LLC</u>, 487 F.3d 309, 317 n.3 (5th Cir. 2007).  "If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action."  <u>McCoy v. City of Shreveport</u>, 492 F.3d 551, 557 (5th Cir. 2007).  "If the defendant advances a legitimate reason

23

for the adverse employment action, then the plaintiff must adduce sufficient evidence that would permit a reasonable trier of fact to find that the proffered reason is a pretext for retaliation." <u>Sherrod</u>, 132 F.3d at 1122.  In order to carry this burden, the plaintiff must "prove that the adverse employment action would not have occurred 'but-for' the protected activity." <u>Id.</u>

    Defendant argues that Plaintiff cannot establish a prima facie case of retaliation.  Defendant does not dispute that Plaintiff engaged in protected activity. Filing an EEOC complaint against an employer based on a reasonable belief that the employer's actions violated the ADA qualifies as protected activity.  <u>See</u> <u>id.</u> Thus, the first element is satisfied.  However, Defendant argues that "Plaintiff cannot establish a prima facie case of retaliation as . . . there is no evidence Plaintiff suffered an adverse employment action nor is there any evidence of a causal link between Plaintiff's protected activity and any adverse employment action."  (Mot. at 17.)

    An adverse employment action is any action that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006) (quoting <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). According to Plaintiff, he suffered an adverse employment action when Defendant

"forced" him to execute an employment contract on September 22, 2011.[5]  (Opp. at

13.)  In the summer of 2011, Dhillon decided to ask his sales staff to execute

employment contracts "to make sure [his] business was protected in regard to

confidential information and to make sure [he] had clear understandings with [the]

sales staff in regard to their commission pay."  (Dhillon Aff.)  At that time,

Defendant "didn't have a good employment contract in place with [the] sales

staff."  (Cupit Depo. at 59:5–6.)  Accordingly, in September of 2011, Plaintiff and

six other employees signed employment contracts with attached commission plans.

(Id.)  Plaintiff's contract contained a commission plan that he and Dhillon came up

with together.  (McBride Depo. at 168:4–9.)  Before signing the contract, Plaintiff

reviewed it with an attorney.  (Id. at 160:20–23.)  However, Plaintiff claims that he

had no choice but to sign the contract, because Cupit told him: "[Y]ou need to sign

this or you're fired."[6]  (Id. at 154:20.)

---

[5]  Plaintiff's counsel suggested at the hearing that Plaintiff's demotion on
May 31, 2011 was also an adverse employment action.  However, Plaintiff did not
file a complaint with the EEOC until August of 2011 (Opp. Ex. 7), and there is no
evidence that Plaintiff engaged in any other protected activity before his demotion.
Furthermore, for the reasons discussed below, Plaintiff has failed to establish that
he was constructively discharged, so constructive discharge cannot be the adverse
employment action that forms the basis for his retaliation claim.

[6]  At the hearing on Defendant's Motion, Plaintiff's counsel stated
unequivocally that his client was also told that he would be fired if he did not drop
his EEOC complaint.  The Court asked Plaintiff's counsel whether there was any
evidence in the record to support that claim.  Plaintiff's counsel suggested that

Plaintiff's commission plan provided that part of the salary of a new employee, Glusing, would be charged to Plaintiff's accounts, and in return Plaintiff would collect a commission for business Glusing generated for Defendant.  (See Mot. Ex. 5 at 11; Dhillon Aff.)  Plaintiff had worked with Glusing when Glusing was employed by one of Defendant's clients, and Plaintiff asked Dhillon to hire Glusing so he and Plaintiff could "grow the business together."  (Dhillon Aff.; McBride Depo. at 168:10–22.)  When Plaintiff received his fourth quarter bonus—for October, November and December—he realized that Glusing's salary had been deducted from it.  (McBride Depo. at 174:11–21.)  Plaintiff testified during his deposition that, when he signed the contract, he understood that Glusing's salary would be taken from his accounts, but he believed that the overhead on the accounts was going to increase.  (Id. at 172:3–8; 173:16–23.)  He did not realize that Glusing's salary would be taken directly from the accounts, and that he (Plaintiff) would see a corresponding decrease in his bonus.  (Id. at 175:11–12, 21–22 ("I thought one thing and – and Amer did another. . . .  I didn't know Mr. Glusing's salary was going to be charged to me directly.").)  This

---

Plaintiff had so testified during his deposition, but after being given an opportunity to search the record, ultimately conceded that there was no direct or circumstantial evidence indicating that Plaintiff had been threatened with termination if he did not drop the EEOC complaint.

action—Defendant taking part of Glusing's salary out of Plaintiff's bonus—was, Plaintiff testified, "the main retaliation."  (<u>Id.</u> at 176:3.)  One of the other employees who signed the employment contract in September 2011, Ben Joseph, entered into a similar agreement whereby another employee's salary was taken out of his bonus.  (Dhillon Aff.)

Defendant argues that "requiring an employee to sign an employment contract . . . cannot reasonably be said to dissuade a reasonable worker from making . . . a charge of employment discrimination," particularly where, as here: (1) the employee played a role in the formation of the contract; (2) he reviewed the contract with an attorney before signing it; and (3) other employees were required to sign similar employment contracts at the same time.  (Mot. at 17–18.)  The Court is inclined to agree.  However, the Court need not decide whether this qualifies as an adverse employment action—or whether Plaintiff has established a causal connection between his protected activity and the alleged adverse employment action—because even if Plaintiff succeeds in making a prima facie showing, his retaliation claim fails.

According to Defendant, it asked Plaintiff to execute a contract in September 2011 because Dhillon decided at that time to execute contracts with every member of Defendant's sales staff so that there was no confusion about

27

commission plans and to bind employees to non-compete agreements.  (Dhillon

Aff.)  Furthermore, Defendant maintains that the contractual provisions relating to

Glusing's salary were not uncommon, and were included in Plaintiff's contract

because Plaintiff wanted to bring Glusing into the company.  Thus, Defendant has

articulated a legitimate, nonretaliatory reason for asking Plaintiff to enter into this

particular contract.

    Defendant having satisfied its burden under the <u>McDonnell Douglas</u>

burden-shifting framework, the burden shifts back to Plaintiff to adduce evidence

sufficient to allow a reasonable trier of fact to conclude that Defendant's proffered

reason is merely a pretext for retaliation.  <u>See Sherrod</u>, 132 F.3d at 1122.  Plaintiff

must prove that Defendant would not have asked him to execute the contract if he

had not filed a charge with the EEOC.  <u>Id.</u> (noting that a plaintiff must "prove that

the adverse employment action would not have occurred 'but-for' the protected

activity").  Plaintiff does not dispute that, before September 2011, Defendant did

not have contracts in place with any members of its sales staff.  He does not

dispute Dhillon's statement that he (Dhillon) wanted the sales staff to execute

contracts to protect Defendant's confidential information and to clarify

understandings about commissions.  Nor does Plaintiff point to any evidence

indicating that Defendant asked six other employees to sign similar contracts in

September 2011 as a pretext for retaliating against him.  Plaintiff acknowledges that he agreed to the commission plan and even helped formulate it—which suggests that he recognizes that the commission plan was not <u>inherently</u> retaliatory—but he claims that the commission plan was retaliatory <u>in practice</u> because it resulted in $15,000 being deducted from his bonus to pay Glusing's salary.  However, Plaintiff makes no attempt to counter Defendant's evidence that another member of the sales staff had a new employee's salary taken out of his bonus as well.  Finally, Plaintiff's testimony that Cupit told him he would be fired if he did not sign the September 2011 employment contract is not evidence of pretext.  It is common business practice for an employer to condition an employee's continued employment on the execution of an employment contract, and perfectly consistent with a non-retaliatory motive—in this case, the desire to have uniform commission plans and non-compete agreements in place.  Plaintiff was not singled out in this regard.

Based on the evidence before the Court, no reasonable trier of fact could conclude that Defendant would not have asked Plaintiff to sign the employment contract "but for" his activities protected by the ADA.  The Court concludes that there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law, and therefore **GRANTS** Defendant summary

judgment on Plaintiff's retaliation claims under the ADA and the TCHRA.

IV.   <u>Constructive Discharge</u>

Plaintiff's final claim is for constructive discharge.  Constructive discharge occurs when an "employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation."  <u>Jurgens v. E.E.O.C.</u>, 903 F.3d 386, 390 (5th Cir. 1990).  Plaintiff claims that he "had no choice but to resign and find alternative employment for his sanity" because of: (1) Villalobos's comments about Plaintiff's Tourette's syndrome; (2) Defendant's failure to address Plaintiff's complaints about Villalobos; and (3) the employment contract executed in September 2011.  (Opp. at 7–8.)  During his deposition, Plaintiff was asked "to tell the court everything [he could] think of that supports [the] claim that [he was] forced out."  (McBride Depo. at 180:5–6.)  Plaintiff replied:

> A:   I – I – it's so many things.  The last straw, sir, was the financial retaliation.
> . . . .
> Q:   Steven Glusing.
> A:   Yes, sir.  That was the last straw.  I – I think when you accumulate getting made fun of and then with Joe coming back and forth, it just – this is when it, you know, hit me really bad.

(McBride Depo. at 180:9–17.)

To prevail on a constructive discharge claim, a plaintiff must establish

that "working conditions [were] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." Aryain v. Wal-Mart Stores Tex. LP, 534 F.3d 473, 480 (5th Cir. 2008) (internal quotation marks omitted).  In determining whether a reasonable employee would feel compelled to resign, the Fifth Circuit has considered the relevancy of the following events:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

Nassar v. Univ. of Tex. Sw. Med. Ctr., 674 F.3d 448, 453 (5th Cir. 2012).  To prove constructive discharge based on harassment, a Plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."  Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 440 (5th Cir. 2005).

Of the seven factors considered relevant by the Fifth Circuit, (3), (4), and (5) are wholly inapplicable.  Although (1) is technically applicable because Plaintiff was demoted from Vice President to Account Executive in May 2011 (Mot. Ex. 5), Plaintiff admits that his pay was not cut and appears to concede that the demotion was warranted (McBride Depo. at 88–89).  Factors (2) and (7) are

31

arguably applicable in this case.  After Plaintiff executed the employment contract in September 2011, his bonus was reduced because Glusing's salary was taken from it, and Plaintiff appears to believe that after he signed the contract, he was employed on terms less favorable than his pre-contract status.  However, it is undisputed that Plaintiff agreed to the terms of the contract and was even a driving force behind the formation of its terms.  (McBride Depo. at 171:12–13 ("I wanted to hire Mr. Glusing, I agreed to this commission.").)  Plaintiff believed he would make more money under the commission plan he formulated with Dhillon than he had before signing the contract (id. at 175:8–12) because he apparently did not understand how the plan would work in practice (id. at 171:13–14 ("The main thing was I – I didn't know that Mr. Glusing's salary was going to be charged against my bonus.")).  All the evidence suggests that Plaintiff signed the contract willingly, and there is no evidence that Defendant misrepresented the terms of the contract or misled Plaintiff.

As for factor (6), Plaintiff claims that Villalobos's comments about his Tourette's syndrome constitute harassment.  However, as discussed above in Part I.A.2, Villalobos's conduct was not sufficiently severe or pervasive enough to qualify as actionable harassment for the purposes of a hostile work environment claim, let alone harassment severe enough to constitute constructive discharge.

Furthermore, despite Plaintiff's claims to the contrary,[7] the evidence shows that

Defendant immediately took action when Plaintiff complained about Villalobos's

conduct in August 2011.  When Plaintiff reported Villalobos's comments to Carter,

Carter in turn told Cupit.  (Cupit Depo. at 37:2.)  Carter, Cupit and Dhillon

investigated the complaint by talking to Adam Ward, who was present when

Villalobos made a comment about Plaintiff's Tourette's syndrome, and to

Villalobos himself.  (Id. at 37–38.)  After Carter, Cupit and Dhillon investigated

the complaint, Villalobos was relocated to a different office (id. at 38:13–14) and

he was told "not to have any conversations with [Plaintiff] and not to have any

interactions with him" (Villalobos Depo. at 56–57).  Dhillon sent Plaintiff an e-

mail on August 22, 2011, which confirmed that Plaintiff would report only to

Dhillon, and stated:

> You and I have worked together for over eight years and have worked
> well with each other.  You know I have [an] open door policy.  If at
> any time you have any question[s] or concern[s] please feel free to
> contact me.  As I always ask at the end of our meetings.  What do I
> want my employees to be?  You answered it right in the meeting.  I
> want all of my employees to be happy here.

(Mot. Ex. 5 at 3.)  When shown this e-mail during his deposition, Plaintiff

---

[7]  Plaintiff's Opposition to Defendant's Motion states: "[Plaintiff's] reporting
of the comments made by Mr. Villalobos was ignored" and "As a result of the
harassment from Mr. Villalobos and upper management's ignoring the complaint
[Plaintiff] had no choice but to file a complaint with the EEOC. . . ."  (Opp. at 11.)

conceded that "on a personal level . . . [Dhillon] was very helpful," and that

"[Dhillon] was trying to make accommodations to – to help [Plaintiff] at

[Defendant]."  (McBride Depo. at 150:24–25, 151:12–13.)  This evidence of

Defendant's response to Plaintiff's complaint demonstrates that any harassment

Plaintiff suffered was not calculated by Defendant to encourage his resignation.

Plaintiff does not point to any evidence suggesting otherwise.

   For the reasons discussed above, none of the seven factors identified

by the Fifth Circuit weigh in favor of a finding of constructive discharge in this

case.  Taking the facts in the light most favorable to Plaintiff, the Court concludes

that a reasonable employee in his position would not have felt compelled to resign.

Accordingly, the Court **GRANTS** Defendant summary judgment on Plaintiff's

constructive discharge claim.

CONCLUSION

   For the foregoing reasons, the Court **GRANTS** Defendant's Motion

for Summary Judgment.  (Doc. # 16.)

   IT IS SO ORDERED.

   DATED: San Antonio, Texas, June 10, 2013.

_____
David Alan Ezra
Senior United States District Judge